## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES WONG, Derivatively on Behalf of LULULEMON ATHLETICA INC., <br><br> Plaintiff, <br><br> CALVIN MCDONALD, MEGHAN FRANK, MARTHA MORFITT, DAVID MUSSAFER, MICHAEL CASEY, SHANE GRANT, KATHRYN HENRY, ALISON LOEHNIS, ISABEL MAHE, JON MCNEILL, EMILY WHITE, and TERI LIST, <br><br> Defendants, <br><br> and <br><br> LULULEMON ATHLETICA INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff James Wong ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant lululemon athletica inc. ("Lululemon" or the "Company"), brings this Verified Shareholder Derivative Complaint against Calvin McDonald ("McDonald"), Meghan Frank ("Frank"), Martha Morfitt ("Morfitt"), David Mussafer ("Mussafer"), Michael Casey ("Casey"), Shane Grant ("Grant"), Kathryn Henry ("Henry"), Alison Loehnis ("Loehnis"), Isabel Mahe ("Mahe"), Jon McNeill ("McNeill"), Emily White ("White"), and Teri List ("List") (collectively, the "Individual Defendants" and, together with Lululemon, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Lululemon with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain current and former Lululemon officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between October 28, 2020 and July 24, 2024, inclusive (the "Relevant Period").

2.      Lululemon is an athletic apparel retailer headquartered in Canada. Lululemon operates stores in North America, Europe, Asia, and Oceania, with over 500 locations globally.

The Company reports sales and revenue in three geographic segments: The Americas, China Mainland, and Rest of World.

3.     In October 2020, the Company announced a new "Impact Agenda" that would include an "area of focus" called "Inclusion, Diversity, Equity, and Action" ("IDEA"), the stated goal of which would be to: "Reflect the diversity of the communities the Company serves and operates in around the world by 2025."

4.     Throughout the Relevant Period, the Individual Defendants caused the Company to fail to disclose that: (i) IDEA was not structured so as to meaningfully combat discrimination within Lululemon; and (ii) as a result, Lululemon employees continued to experience discriminatory treatment.

5.     The truth regarding IDEA emerged on November 20, 2023, when the Business of Fashion, and online publication, published an article titled "At Lululemon, Being Black is 'Off-Brand'" (the "BoF Article"). The BoF Article contained accounts from fourteen former Lululemon employees, all of whom maintained that the Company possesses "a corporate culture that is unwelcoming of Black people." The BoF Article further accused IDEA of "protecting the Company's image" thereby "reducing its effectiveness and in many ways exacerbating underlying issues."

6.     In addition to the foregoing, throughout the Relevant Period, the Individual Defendants caused the Company to conceal significant issues with the Company's inventory allocation methods.

7.     The truth regarding the inventory issues began to emerge on March 21, 2024 when the Company revealed stagnating growth in the Americas region. On this news, the price of the

Company's common stock fell $75.65 per share, or more than 15%, from a closing price of $478.84 per share on March 21, 2024 to a closing price of $403.19 per share on March 22, 2024.

8.      Then, on July 24, 2024, Bloomberg issued a report revealing that inconsistent inventory allocation, both in-store and online, negatively affected the Company's launch of its Breezethrough leggings earlier in July. On this news, the price of the Company's common stock fell more than 3%, from a closing price of $281.37 per share on July 23, 2024 to a closing price of $272.06 per share on July 24, 2024.

9.      The truth fully emerged on July 25, 2025, when Bloomberg reported that a spokesperson for the Company had revealed that the Company "made the decision to pause on sales [of the Breezethrough yoga wear] for now to make any adjustments necessary to deliver the best possible product experience." On this news, the price of the Company's common stock fell an additional $24.74 per share, or approximately 9%, from a closing price of $272.06 per share on July 24, 2024 to a closing price of $247.32 per share on July 25, 2024.

10.      In light of the Individual Defendants' misconduct, the Company, as well as Defendants McDonald and Frank, were named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York, captioned *Patel v. lululemon athletica inc., et al.,* Case No. 1:24-cv-06033-ALC (S.D.N.Y.) (the "Securities Class Action"). The Securities Class Action has further subjected Lululemon to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

11.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein raise a federal question under Sections 10(b), 14(a),

20(a), and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a), 78n-1, and 78u-4(f)) and Rules 10b-5 (17 C.F.R. § 240.10b-5) and 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

12.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

14.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

16.    Plaintiff is a current shareholder of Lululemon and has continuously held Lululemon common stock at all relevant times.

17.    Nominal Defendant Lululemon is incorporated under the laws of Delaware, and its principal executive offices are located at 1818 Cornwall Avenue, Vancouver, British Columbia, Canada V6J 1C7. The Company's common stock trades on the Nasdaq under the symbol "LULU."

18.    Defendant Morfitt has served as a Company director since December 2008 and as Chair of the Board since March 2022. Defendant Morfitt is a member of the Board's Audit Committee. According to the proxy statement filed on Schedule 14A with the SEC on April 25,

2024 (the "2024 Proxy Statement"), in 2023, Defendant Morfitt received $417,090 in total compensation.

19.     Defendant Mussafer has served as a Company director since September 2014. Defendant Mussafer is the Chair of the Board's Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant Mussafer received $320,424 in total compensation.

20.     Defendant McDonald has served as a Company director and as the Company's Chief Executive Officer ("CEO") since August 2018. According to the 2024 Proxy Statement, in 2023, Defendant McDonald received $16,494,777 in total compensation.

21.     Defendant Casey has served as a Company director since October 2007 and previously served as Chair of the Board from May 2014 to September 2014. Defendant Casey is the Chair of the Board's Audit Committee and a member of the Board's People, Culture and Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Casey received $297,924 in total compensation.

22.     Defendant Grant has served as a Company director since November 2023. Defendant Grant is a member of the Board's Audit Committee. According to the 2024 Proxy Statement, in 2023, Defendant Grant received $49,647 in total compensation.

23.     Defendant Henry has served as a Company director since January 2016. Defendant Henry is a member of the Board's Audit Committee and the People, Culture and Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Henry received $269,590 in total compensation.

24.     Defendant List has served as a Company director since March 2024. Defendant List is a member of the Board's Audit Committee.

25.     Defendant Loehnis has served as a Company director since January 2022. Defendant Loehnis is a member of the Board's Audit Committee. According to the 2024 Proxy Statement, in 2023, Defendant Loehnis received $257,090 in total compensation.

26.     Defendant Mahe has served as a Company director since November 2022. Defendant Mahe is a member of the Board's Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant Mahe received $272,773 in total compensation.

27.     Defendant McNeill has served as a Company director since April 2016. Defendant McNeill is a member of the Board's Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant McNeill received $254,590 in total compensation.

28.     Defendant White has served as a Company director since November 2011. Defendant White is the Chair of the Board's People, Culture and Compensation Committee and a member of the Corporate Responsibility, Sustainability, and Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant White received $290,840 in total compensation.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29.     By reason of their positions as officers, directors, and/or fiduciaries of Lululemon and because of their ability to control the business and corporate affairs of Lululemon, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

30.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

32.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so

8

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

33.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE GLOBAL CODE OF BUSINESS CONDUCT AND ETHICS

34.     Lululemon maintains a Global Code of Business Conduct and Ethics (the "Code of Conduct"), which states that it "applies to all lululemon employees, ambassadors, contractors, officers, and directors." The Code of Conduct further states that the Company "support[s] a workplace environment that neither pressures nor encourages anyone to compromise our company's values or standards of conduct."

35.     In a section titled "We comply with all laws, and in doing so we contributed to healthy communities," the Code of Conduct states the following, in relevant part:

> We are all expected to comply with the law. This includes not only following the laws of our home market, but also complying with local laws when visiting different markets or transacting business with individuals, organizations, or guests located in a different market.

*        *        *

> **Insider Trading Laws**
>
> We may not buy or sell shares of lululemon stock (or securities of other companies) if we know of material information that has not been made public. Material information is any information that would influence a reasonable investor's decision to buy or sell stock. Examples of "material information" include consolidated sales figures, the departure of an executive, or a significant issue with a key supplier. Trading in shares while in possession of non-public material information is a serious violation of securities law as is providing non-public material information to someone who may trade in our shares. Never provide material non-public information to other people, including family members or friends as it may enable them to improperly buy or sell securities using confidential information. Please refer to our Insider Trading Policy for more information. Members of our board of directors, executive officers, and certain other employees have additional restrictions on trading in lululemon securities, which are outlined in our Insider Trading Policy.

36.     In a section titled "We are all responsible for fostering a respectful and inclusive workplace," the Code of Conduct provides the following, in relevant part:

10

We stand for humanity, diversity, and empathy. We strive to provide an environment that creates the conditions for all employees to excel, be creative, take initiatives, feel a sense of belonging, and seize opportunities. Teamwork and collaboration help us to leverage our diverse backgrounds, talents, and ideas for innovative and fresh solutions. Our commitment to inclusive behaviour and ethical conduct, aligned with our values of inclusion and personal responsibility, govern how we interact with guests, vendors, colleagues, and members of the public at all times.

\*     \*     \*

We do not tolerate racism, discrimination, harassment or hate. The diversity of our workforce is a critical asset that helps us achieve our goals. We are committed to providing equal opportunity in all aspects of employment and will not tolerate discrimination on the basis of race, color, creed, age, sex, sexual orientation, gender identity or gender expression, national origin, religion, body size, family status, marital status, medical condition, physical or mental disability, military service, pregnancy, childbirth and related medical conditions, or any other legally protected status. We will not tolerate harassment or unlawful behaviours of any kind, including derogatory comments or conduct based on sexual orientation, race, ethnicity, or any other protected status.

37.     In a section titled "Personal responsibility is the path to success," the Code of

Conduct states the following, in relevant part:

**Protecting lululemon's Assets**

We all have a responsibility to protect lululemon's assets from improper use or disclosure. This includes, among other things, protecting all non-public information from disclosure, including our trade secrets, design information, information about our suppliers, contracts, and manufacturing processes, guest information, financial information and employee and pricing data, as well as not reproducing licensed or internally developed software for personal use. We also don't permit unauthorized photography or video recording of any nature in our stores, the SSC, the DCs or any other lululemon property.

\*     \*     \*

**Accurate Records**

We must follow our system of internal controls and disclosure controls and ensure that corporate records and all securities filings are timely, legitimate, and accurate. Creating false or misleading records is prohibited, and all financial accounts, reports, and records are expected to be fair, accurate, and appropriately authorized.

**Document Retention**

We are expected to comply with all records management policies and legal hold notices. These policies apply to retention and destruction of all records created by lululemon, including, but not limited to, hard copies, electronic files, emails, instant messages, video, and backup tapes.

38.    In a section titled "Questions, concerns, and dealing with investigations," the Code of Conduct states the following, in relevant part:

**Waivers**

Waivers or exceptions to the Code for any employee will be granted only in advance and under exceptional circumstances by the Legal department. A waiver of the Code for any executive officer or member of our board of directors may be made only by the board of directors or a designated committee of the board.

## THE AUDIT COMMITTEE CHARTER

39.    Lululemon also maintains an Audit Committee Charter (the "Charter"), which explains that the purpose of the Board's Audit Committee as follows, in relevant part:

The Audit Committee (the "Committee") is a standing committee of the Board of Directors of lululemon athletica inc. (the "Company"). The primary purpose of the Committee is to assist the Board of Directors in undertaking and fulfilling its oversight responsibilities in connection with:

- reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports;

- reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics;

- reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company;

- reviewing the Company's Global Risk & Advisory Services function;

- monitoring compliance with legal and regulatory requirements and overseeing the Company's corporate compliance program;

- monitoring the independence and performance of the Company's independent public accountants;

- overseeing the Company's financial risk assessment and risk management

12

policies, procedures and practices;

- overseeing the Company's enterprise risk assessment and management policies, procedures and practices (including regarding those risks related to information security, cyber security and data protection); and

- providing effective communication among the Board of Directors, senior and financial management and the Company's independent public accountants.

40. The Charter then goes on to detail the "Duties and Responsibilities" of the Audit Committee as follows:

**Review of Financial Reports and Press Releases**

- The Committee shall review and discuss with management and the independent public accountants the audited financial statements and related footnotes to be included in the Company's Annual Report on Form 10-K (or the Annual Report to Stockholders if distributed prior to the filing of Form 10-K) prior to the filing of the Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") and review and discuss with the independent public accountants the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board (PCAOB) and the SEC, and if applicable, the Canadian securities regulatory authorities. The Committee shall recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

- The Committee shall review with management and the independent public accountants interim financial results to be included in the Company's quarterly reports on Form 10-Q to be filed with the SEC and, if applicable, the Canadian securities regulatory authorities, MD&A and the matters required to be discussed by the applicable requirements of the PCAOB and the SEC prior to the Company's filing of any Form 10-Q.

- The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer, or the Company's disclosure committee or any member thereof, during their certification process for the Form 10-K or Form 10-Q and for the certifications, if applicable, required to be filed with the Canadian securities regulatory authorities, as appropriate. In addition, the Committee shall discuss with the Company's management and independent public accountants whether the Company's quarterly financial statements as well as significant events, transactions and changes in accounting estimates were considered by the independent public accountants (after performing their required quarterly

review) to have affected the quality of the Company's financial reporting. Such reviews will occur prior to the Company's filing of the Form 10-K, Form 10-Q and, to the extent practicable, prior to the quarterly earnings release. The Committee shall review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), as well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee. Such discussion may be general in nature (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

**Independent Public Accountants**

- The Committee has responsibility for the retention and termination of the Company's independent public accountants and to set its fees.

- The Committee shall review with the independent public accountants the scope of the prospective audit, the estimated fees therefor and such other matters pertaining to such audit as the Committee may deem appropriate.

- The Committee shall review written disclosures received from the independent auditors regarding the auditors' independence, as required by the applicable requirements for the PCAOB, and shall discuss with the independent auditors their independence.

- The Committee shall pre-approve all auditing services and permitted non-audit services (including the fees for such services and terms thereof) to be performed for the Company or its subsidiary entities by its independent public accountant in one of two methods. For all auditing services, the engagement to render the services would be entered into pursuant to preapproval policies and procedures established by the Committee, provided (i) the policies and procedures are detailed as to the services to be performed, (ii) the Committee is informed of each service, and (iii) such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management. For non-audit services, the engagement to render the services would be presented to and preapproved by the Committee (subject to the de minimis exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act that are approved by the Committee prior to the completion of the audit). The Committee's chairperson will have the authority to grant pre-approvals of audit and permissible non-audit services by the independent public accountants, and all pre-approvals by the chairperson must be presented to the full Committee at its next scheduled meeting.

- At least annually, the Committee shall receive and review a report by independent public accountants describing:

> o the Company's internal quality-control procedures, other matters relating to the accounting procedures and the books and records of the Company and the correction of controls deemed to be deficient;
>
> o any material issues raised by the most recent internal quality-control review, or peer review, of the Company, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and
>
> o all relationships between the independent public accountants and the Company.  The report shall include a statement as to whether the relationships between the independent public accountant and the Company will impact on the independent public accountant's objectivity and independence.

- The Committee shall obtain the independent public accountant's assurance that the audit was conducted in a manner consistent with the Exchange Act, and other provisions of applicable law.

- The Committee shall take appropriate action to ensure the continuing objectivity and independence of the independent public accountants.

- The Committee shall review and discuss quarterly reports from the Company's independent public accountants regarding:

> o all critical accounting policies and practices to be used;
>
> o all alternative disclosures and treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent public accountant; and
>
> o all material written communications between the independent public accountants and management, such as any management letter or schedule of unadjusted differences.

- The Committee shall recommend to the Board of Directors policies for the Company's hiring of partners, employees, former partners or former employees of the independent public accountants who participated in any capacity in the audit of the Company.

**Financial Reporting, Accounting Principles and Internal Control Matters**

- The Committee shall advise management and the independent public accountants that they are expected to provide the Committee with a timely analysis of significant financial reporting, accounting, or internal control matters.

- The Committee shall review with the Company's management and the independent public accountants their judgments about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and transparency of the disclosures in the financial statements.

- The Committee shall make or cause to be made, from time to time, such other examinations or reviews as the Committee may deem advisable with respect to the adequacy of the systems of internal controls and accounting practices of the Company and its subsidiaries and with respect to current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

- The Committee shall adopt and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- The Committee may take all other appropriate action, including notifying the SEC, and, if applicable, the Canadian securities regulatory authorities, if the Company fails in any material respect to implement an appropriate response that the Committee has recommended for adoption by the Company.

**Oversight of the Global Risk & Advisory Services Function**

- The Committee shall review the qualifications of the Global Risk & Advisory Services function and concur on the appointment and replacement of the senior Global Risk & Advisory Services executive. Additionally, the Committee may review periodically the staffing plans, department responsibilities, and budget.

- The Committee shall review the Global Risk & Advisory Services function of the Company, including its independence and authority in the Company's reporting processes, the proposed audit plan for the coming year, and the coordination of such plans with the independent public accountants.

- The Committee shall review, as necessary, the adverse findings from Global Risk & Advisory Services reports along with management's responses. As appropriate, review and discuss with management these findings, repeat audit findings in prior audits or delays in corrective action plans.

- The Committee shall annually review any charter setting out the responsibilities of the Global Risk & Advisory Services function and approve any changes thereto as the Committee deems necessary or appropriate.

**Risk Oversight**

- The Committee shall review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements.

- The Committee shall meet periodically, but no less than quarterly, with management, the Company's Global Risk & Advisory Services team and the Company's independent public accountants to review and discuss the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks.

- The Committee shall regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security and data protection).

- The Committee shall review and monitor the Company's cybersecurity and information security policies and procedures regarding cybersecurity and information security, and shall regularly report to the Board of Directors at such intervals as determined by the Committee the substance of those reviews and, as necessary, recommend to the Board of Directors such actions as the Committee determines necessary or advisable.

- The Committee shall report its risk oversight activities to the Board of Directors on a regular basis, but no less than annually, and in that regard shall make such recommendations to the Board of Directors with respect to risk assessment and risk management as the Committee may deem necessary or appropriate.

## <u>THE CORPORATE GOVERNANCE GUIDELINES</u>

41.    Lululemon maintains "Corporate Governance Guidelines" (the "Guidelines") that

detail the role and responsibilities of the Board as follows:

17

The Board of Directors (the "Board"), which is elected by the stockholders, is the ultimate decision-making body of lululemon athletica inc. (the "Company") except with respect to those matters reserved to the stockholders. The Board selects the senior management team, which is charged with the day-to-day conduct of the Company's business. Having selected the senior management team, the Board acts as an advisor and counselor to senior management and ultimately monitors its performance.

The fundamental role of the members of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. In fulfilling that responsibility, the directors may reasonably rely on the honesty and integrity of the Company's senior management and expert legal, accounting, financial and other advisors.

Directors are expected to attend Board and applicable committee meetings, absent extraordinary circumstances, and to review meeting materials in advance of such meetings. Directors are encouraged to attend the Company's annual meetings of stockholders.

42.    In a section titled "Risk Oversight," the Guidelines provide the following:

In its governance role, and particularly in exercising its duty of care and diligence, the Board is responsible for ensuring that appropriate risk management policies and procedures are in place to protect the Company's assets and business. While the Board has the ultimate oversight responsibility for the risk management process, the Board has delegated to the Audit Committee the initial responsibility of overseeing the Company's risk assessment and risk management. In fulfilling its delegated responsibility, the Audit Committee requires management to ensure that an approach to risk management is implemented as a part of the day- to-day operations of the Company, and to design internal control systems with a view to identifying and managing material risks. On a periodic basis (not less than quarterly), the Audit Committee reviews and discusses with the Company's Chief Executive Officer, its Risk and Advisory team and its Finance team the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks. In addition, the Audit Committee evaluates the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management, including discussing with management material risk exposures and the steps being taken to monitor, control and report such risks. The Audit Committee reports its activities to the full Board on a regular basis (not less than annually) and is responsible for making such recommendations with respect to risk assessment and management as it may deem necessary or appropriate. On a periodic basis (not less than annually), the PCC Committee reviews the various design elements of the Company's compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk- taking by the Company's executive officers. The PCC Committee reports its activities in this regard to the full Board and makes such

recommendations to the Board with respect to the Company's compensation policies and practices as it may deem necessary or appropriate.

The Board oversees environmental, social and governance ("ESG") management at the Company and has delegated responsibility to both the Audit Committee and the CRSG Committee. The Board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies, and practices related to matters of sustainability and corporate responsibility that may have a material impact on the Company. As part of this function, the Board and its committees review and discuss reports submitted by management with respect to the Company's current goals and metrics, as well as significant events, issues and risks that may affect the Company's business or financial performance.

## SUBSTANTIVE ALLEGATIONS

### A. False and Misleading Statements Regarding the IDEA Program

43.     On October 28, 2020, Lululemon issued a press release announcing the Company's "first-ever Impact Agenda detailing the Company's long-term strategy to become a more sustainable and equitable business, minimize its environmental impact, and accelerate positive change both internally and externally." As part of the Impact Agenda, the Company established the Inclusion, Diversity, Equity, and Action ("IDEA") program, the stated goal of which is to: "Reflect the diversity of the communities the Company serves and operates in around the world by 2025."

44.     In a written message on the Company's website, Defendant McDonald wrote that the Company launched IDEA because: "In 2020, after many real and impactful conversations with our underrepresented employees and our greater community, we heard loud and clear that we needed to evolve behaviours both within our own walls and our collective." Defendant McDonald went on to write that:

IDEA – Inclusion, Diversity, Equity and Action – focuses on making systemic changes. By standing up and funding IDEA, and creating our commitments grounded in action and accountability, we are determined to be engaged and act in allyship.

> For us, IDEA is a critical business function that is embedded into everything we do. We are proud of the progress we are making, and we are a stronger company because of the culture we continue to build together.

45.    On October 30, 2020, the Company issued a press release announcing that it had hired Stacia Jones ("Jones") as Vice President, Global Head of IDEA.

46.    On March 30, 2021, the Company filed an annual report on Form 10-K with the SEC (the "2020 Form 10-K"). The 2020 Form 10-K was signed by Defendants McDonald, Frank, Casey, Henry, McNeill, Morfitt, Mussafer, and White. Regarding IDEA, the 2020 Form 10-K stated the following, in relevant part:

> We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

> Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

> \*        \*        \*

> We are investing $5 million to fund to our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development. We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

47.    On March 29, 2022, the Company filed an annual report on Form 10-K with the SEC (the "2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants McDonald, Frank, Casey, Henry, Loehnis, McNeill, Morfitt, Mussafer, and White. Regarding IDEA, the 2021 Form 10-K stated the following, in relevant part:

> We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

*     *     *

We expect to invest at least $5 million annually to fund our global IDEA activities. These funds can further support the career progress of our diverse talent and increase access to internal opportunities and professional development. We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

48.     On March 28, 2023, the Company filed an annual report on Form 10-K with the SEC (the "2022 Form 10-K"). The 2022 Form 10-K was signed by Defendants McDonald, Frank, Casey, Mahe, Henry, Loehnis, McNeill, Morfitt, Mussafer, and White. Regarding IDEA, the 2022 Form 10-K stated the following, in relevant part:

We continually endeavor to create an environment that is equitable, inclusive, and fosters personal growth.

Diversity and inclusion are key components of our culture and are fundamental to achieving our strategic priorities and future vision. The diversity of our teams and working in an inclusive culture enables increased employee engagement, better decision making, greater adaptability, creativity, and a deeper understanding of the communities we serve.

*     *     *

We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We have established People Networks, which are employee resource groups that represent employees who have marginalized and historically underrepresented identities. We see significant engagement in IDEA education and training across our global employee base. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

49.    On March 21, 2024, the Company filed an annual report on Form 10-K with the SEC (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants McDonald, Frank, Casey, Grant, Mahe, Henry, List, Loehnis, McNeill, Morfitt, Mussafer, and White. Regarding IDEA, the 2023 Form 10-K stated the following, in relevant part:

> We believe IDEA is fundamental for shaping and building our company, industry, and communities, and for creating a shared sense of respect and belonging. By continuously striving to be an inclusive, diverse, and equitable organization, we aim to reflect a variety of perspectives and meet the needs of the global communities we serve.
>
> *       *       *
>
> We offer all employees IDEA education, training, and guided conversations on a variety of topics, including anti-racism, anti-discrimination, and inclusive leadership behaviors. We have established People Networks, which are employee resource groups for employees who have marginalized and historically underrepresented identities. We see significant engagement in IDEA education and training across our global employee base. We aim to foster a culture of inclusion by making IDEA part of our everyday conversation, and frequently review our policies, programs, and practices to identify ways to be more inclusive and equitable.

50.    The statements contained in ¶¶ 43-49 were false and misleading and failed to disclose that: (i) IDEA was not structured so as to meaningfully combat discrimination within Lululemon; and (ii) as a result, Lululemon employees continued to experience discriminatory treatment. Moreover, by failing to ensure that IDEA was structured so as to effectively combat discrimination, the Individual Defendants violated the Code of Conduct.

## B.  The Truth Regarding the IDEA Program is Revealed

51.    On November 20, 2023, The Business of Fashion, which describes itself as the leading digital authority on the global fashion industry, published an article titled "At Lululemon, Being Black is 'Off-Brand'" (the "BoF Article"). The BoF Article interviewed fourteen current and former Lululemon employees who allege that IDEA failed to achieve its stated goals and, in some cases, perpetuated discriminatory treatment of Lululemon employees. According to the BoF

Article, the accounts of these former employees:

> describe a corporate culture that is unwelcoming of Black people and leaders regularly use stereotypes to define and ostracise minority employees, who face barriers to career advancement that don't seem to apply to white colleagues. Staffers who drew the company's attention to these issues told BoF they were passed over for promotions, reprimanded, and, in several cases, had their employment terminated.

52. Among other similar accounts, the BoF Article tells the story of a Chicago-area Lululemon store that was closed by management after the store's general manager hired a team of Black associates. Following the store's closure, at least six of the store's sixteen former employees filed complaints against the Company with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination.

53. The BoF Article also provides the account of one former Black employee who was placed on an improvement plan in June 2022. The employee stated that he believed he was placed on the plan for not "adjusting his language, syntax and grammar to fit in with white colleagues when writing emails and other correspondence." After receiving the improvement plan, the former employee submitted an internal complaint "raising concerns that he believed racial discrimination was at play." According to the BoF Article, the Company informed the former employee that a third-party investigation "did not substantiate" his discrimination claims. The following week, the employee received a termination letter that was viewed by BoF. The BoF Article described the contents of the termination letter as follows:

> Lululemon wrote to [the former employee] that his "belief that Lululemon has a discriminatory culture," and his potential to share those views with job candidates rendered him unable to promote the company as "a positive place to work," which is "critical" to his role as a recruiter.

54. The BoF Article further alleges that the Company's internal handling of discrimination claims was marred by a conflict of interest. Three former employees "with direct knowledge of how IDEA operates" told BoF that IDEA "played a role in investigating and

23

responding to internal complaints of racism." According to the BoF Article, Jones was named as "head of employee relations, policy, and compliance" in May 2023 and continued to hold that role in addition to heading IDEA. However, the article notes that the Company maintains that discrimination claims are to be handled by the employee relations division, which, as the BoF Article points out, raises ethical concerns as to how Jones could both fairly investigate claims of discrimination in her employee relations role while also combatting discrimination in her IDEA role.

55.     Describing IDEA as a "misguided DEI initiative," the BoF Articles then states that "Several former employees, including two who worked in the IDEA department, told BoF that they were sceptical of Jones' ability to drive the deep organisational change that the IDEA department promised." The article then closes by explaining the following flaw with IDEA:

> the risk in having DEI sit inside HR — as Lululemon's IDEA department is designed — is that it can be difficult to distinguish between who should be handling what . . . When a diversity chief like Jones reports to the head of that department rather than a CEO, there's a significant risk that diversity is left out of the company's "grand strategy," which is mostly designed by members of the C-Suite — not the HR department.

56.     Following the release of the BoF Article, other publications published articles citing the allegations raised by the BoF Article. On January 5, 2024, during market hours, Yahoo! Finance published an article titled "Lululemon Accused of Performative DEI Practices With a Former Employee Claiming A Supervisor Told Her, 'We Just Need to Ride this Wave.'"

57.     On this news, Lululemon's share price fell $4.90, or roughly 1%, from a close of $496.00 on January 4, 2024, to a close of $491.10 on January 5, 2024.

### C. False and Misleading Statements Regarding the Company's Inventory Allocation Issues

58.     On December 7, 2023, the Company issued a press release announcing the Company's net revenue "increased 19% to 2.2 billion" and income from operations "decreased 4%

to $338.1 million." The press release then provided the following quote from Defendant McDonald: "This was another strong quarter for lululemon as our innovative product offerings and community activations continued to powerfully resonate with our guests globally."

59.     That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "3Q23 Form 10-Q"). Appended to the 3Q23 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McDonald and Frank attesting to the accuracy of the financial reporting contained in the report.

60.     The  3Q23 Form 10-Q contained the following risk disclosure:

If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

61.     Regarding the Company's inventory allocation, the 3Q 2023 10-Q stated the following, in relevant part:

The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed. Our inventory balance as of October 29, 2023 was $1.7 billion, a decrease of 4% from October 30, 2022.

62.     On January 8, 2024, the Company issued a press release (the "January 2024 Press Release") announcing that "for the fourth quarter of fiscal 2023, the Company now expects net revenue will be in the range of $3.170 billion to $3.190 billion, representing a 14% to 15% increase compared to the fourth quarter of fiscal 2022," up from the "previous guidance range of $3.135 billion to $3.170 billion."

63.     The January 2024 Press Release also stated the following, in relevant part:

Diluted earnings per share are now expected to be in the range of $4.96 to $5.00 for the fourth quarter of fiscal 2023 compared to the Company's previous guidance range of $4.85 to $4.93.

The Company now expects gross margin to be in the range of 58.6% to 58.7% for the fourth quarter of fiscal 2023, compared to its previous guidance of 58.3% to 58.6%. There is no change to the Company's previous guidance for selling, general, and administrative expenses or effective tax rate.

Meghan Frank, Chief Financial Officer, commented: "We are pleased with our performance during the holiday season, as guests continue to respond well to our innovative and versatile product offerings. Our sales trend remains balanced across channels, categories, and geographies, enabling us to raise our guidance for the fourth quarter and close out another strong year."

**D.  The Truth Regarding the Company's Inventory Allocation Issues Begins to Emerge**

64.    On March 21, 2024, the Company issued press release (the "March 2024 Press Release") announcing its financial results for the fourth quarter of 2023 and full year 2023. The March 2024 Press Release reported that net revenue in the Americas grew by 9% during the fourth quarter and 12% for fiscal year 2023, falling short of the 29% growth from the previous year and 12% growth in the prior quarter. Specifically, the March 2024 Press Release announced the following, in relevant part:

**For the fourth quarter of 2023, compared to the fourth quarter of 2022:**

- Net revenue increased 16% to $3.2 billion.

  o  Americas net revenue increased 9%

  *      *      *

  o  Americas comparable sales increased 7%.

  *      *      *

- For 2023 compared to 2022:

  o  Net revenue increased 19% to $9.6 billion, or increased 20% on a constant dollar basis.

  o  Americas net revenue increased 12%.

  *      *      *

> o  Americas comparable sales increased 8%, or 9% on a constant dollar basis.
>
> *    *    *
>
> During the fourth quarter, we saw continued momentum across our channels, geographies, and merchandise categories, driven by our teams around the world. As we step into 2024, we are focused on the significant opportunities ahead for lululemon as we navigate the dynamic retail environment and deliver for guests through innovative new products and brand activations."

65.    That same day, the Company held an earnings call to discuss its financial results announced in the March 2024 Press Release. During the earnings call, Defendant McDonald stated the following, in relevant part:

> As I mentioned, our sizing in particular in zero to four is something we're chasing into. Color, where we had color, it performed well. And honestly, we just did not have enough. And both of these attributes over-index in the U.S., which is where I see the opportunity. And we're going to continue to play offense in the market. The innovation product pipeline remains very strong for this year and we have some exciting brand initiatives in addition.
>
> Where that's showing up? We're seeing a slowdown in traffic in the U.S., but it's still positive and conversion is down slightly. And I link that to some of the product opportunities we have in the sizing and color, which as I said, we will -- we are chasing until we will get stronger through the quarters.

66.    On this news, the price of the Company's common stock fell more than 15%, from a closing price of $478.84 per share on March 21, 2024 to close at $403.19 per share on March 22, 2024.

67.    The same day, the Company filed the 2023 Form 10-K. Appended to the 2023 Form 10-K were SOX certifications signed by Defendants McDonald and Frank attesting to the accuracy of the financial reporting contained in the report.

68.    The 2023 Form 10-K provided the following risk disclosure:

> If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

\*    \*    \*

Our results of operations could be materially harmed if we are unable to accurately forecast guest demand for our products.

69.    Regarding the Company's inventory allocation, the 2023 Form 10-K stated the following, in relevant part:

> The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed. Our inventory balance as of January 28, 2024 was $1.3 billion, a decrease of 9% from January 29, 2023. We expect our inventories to decrease during the first half of 2024 compared to the first half of 2023, and then increase in the second half of 2024 compared to the second half of 2023.

70.    On April 25, 2024, the Company filed the 2024 Proxy Statement. Defendants McDonald, Casey, Grant, Henry, List, Loehnis, McNeill, Mahe, Morfitt, Mussafer, and White solicited the 2024 Proxy Statement, which asked Lululemon shareholders to approve, *inter alia*: (1) the re-election of Defendants McDonald, Mahe, Morfitt, White, Grant, and List to the Board; (2) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) on an advisory basis, the compensation of the Company's named executive officers.

71.    Regarding "Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> In its governance role, and particularly in exercising its duty of care and diligence, our board of directors is responsible for overseeing and assessing risk management policies and procedures designed to protect the company's assets and business. While our board of directors has the ultimate oversight responsibility for the risk management process, our board of directors has delegated to the audit committee the initial responsibility of overseeing the company's risk assessment and risk management. In fulfilling its delegated responsibility, the audit committee has directed management to ensure that an approach to risk management is implemented as a part of the day-to-day operations of lululemon, and to design internal control systems with a view to identifying and managing material risks.

On a periodic basis, the audit committee reviews and discusses with the appropriate members of our finance team and our internal auditors the company's significant financial risk exposures and the steps that management has taken to monitor, control, and report those risks. In addition, the audit committee regularly evaluates the company's policies, procedures, and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security, and data protection), including discussions with management about material risk exposures and the steps being taken to monitor, control, and report those risks. The audit committee reports its activities to the full board of directors on a regular basis and in that regard makes such recommendations to our board of directors with respect to risk assessment and management as it may deem necessary or appropriate.

Further to its risk oversight role delegated from the board, the audit committee maintains a cybersecurity sub-committee that is comprised of our Chief Information Officer ("CIO"), our Chief Information Security Officer ("CISO"), and representatives from the audit committee and board of directors that have knowledge and experience in cybersecurity matters. The cybersecurity sub-committee reviews our cybersecurity risk assessments and the steps being taken to monitor, control, and report on those risks as well as discusses regulatory and market developments. They also review our process for identifying and responding to cybersecurity incidents in a timely manner, and details of cybersecurity attacks or incidents which have occurred. Management generally meets with, and provides reports to, the cybersecurity sub-committee on a quarterly basis. Our CIO and CISO also meet with and provide reports to the audit committee at least quarterly. The board of directors receives periodic reports regarding the activities of the cybersecurity sub-committee. These reports and meetings are designed to inform the board of directors and committees about the current state of our information security program including cybersecurity risks, the nature, timing, and extent of cybersecurity incidents, if any, and the resolution of such matters.

On a periodic basis, the people, culture and compensation committee reviews the various design elements of our compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk-taking by our executive officers. The people, culture and compensation committee reports its activities in this regard to the full board of directors and makes such recommendations to our board of directors with respect to our compensation policies and practices as it may deem necessary or appropriate.

The board oversees environmental, social and governance management of the company and has delegated responsibility to both the audit committee and the corporate responsibility, sustainability and governance committee. The board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies and practices related to matters of sustainability and corporate responsibility that may have material impact on the company. As part of this function, the board and its committees review and

discuss reports submitted by management with respect to the company's current goals and metrics, as well as significant events, issues and risks that may affect the company's business or financial performance.

72.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

We have adopted a code of business conduct and ethics that applies to all of the officers, directors and employees of lululemon and our subsidiaries. The most current version is available on our website at www.lululemon.com. If we make any substantive amendments to the code or grant any waiver from a provision of the code to any executive officer or director, we will disclose the nature of the amendment or waiver on our website, as well as via any other means required by Nasdaq rules or applicable law.

73.    On June 6, 2024, Company shareholders voted to approve the proposals set forth in ¶ 70.

74.    On May 21, 2024, the Company issued a press release (the "May 2024 Press Release") announcing that the Company was "implementing an updated and more integrated organizational structure," which was "intended to support the company's near- and long-term growth plans, accelerate product innovation, and further enable its go-to-market strategies."

75.    The May 2024 Press Release contained the following quote from Defendant McDonald: "the new structure will enable us to solve for the unmet needs of our guests in a more efficient, unique, and powerful way."

76.    On June 5, 2024, the Company issued a press release (the "June 2024 Press Release") announcing that the Company's revenue "increased 10% to $2.2 billion" and income from operations "increased 8% to $432.6 million." The June 2024 Press Release further stated, in relevant part:

Guests responded well to our product innovations across categories, and we are pleased by the progress we are making to optimize our U.S. product assortment. Looking ahead, we continue to have a significant runway for growth and are confident in our team's ability to powerfully deliver for our guests in 2024 and beyond.

77.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q1 2024 Form 10-Q"). Appended to the Q1 2024 Form 10-Q were SOX certifications signed by Defendants McDonald and Frank attesting to the accuracy of the financial reporting contained in the report.

78.    The Q1 2024 Form 10-Q contained the following risk disclosure:

If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

79.    Regarding the Company's inventory allocation procedures, the Q1 2024 Form 10-Q stated the following:

The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed. Our inventory balance as of April 28, 2024 was $1.3 billion, a decrease of 15% from April 30, 2023.

80.    The statements contained in ¶¶ 58-63, 68-72, and 74-79 were materially false and misleading and failed to disclose that: (i) the Company was experiencing issues with its inventory allocation and color palette execution; (ii) as a result, the Breezethrough legging launch underperformed; (iii) due to the foregoing, the Company's sales in the Americas began to stall; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**E.  The Truth Regarding the Company's Inventory Allocation Issues Full Emerges**

81.    On July 24, 2024, Bloomberg published an article revealing that Lululemon's new Breezethrough leggings launch was "raising concern[]", noting that the launch had suffered from "inconsistent" inventory allocation and pricing, with "certain locations carr[ying] Breezethrough leggings while others didn't carry the new line," suggesting "ongoing allocation-related issues."

82.    On this news, the Company's stock price fell $9.31, or more than 3%, to close at $272.06 per share on July 24, 2024, on unusually heavy trading volume.

83.    Then, on July 25, 2024, Bloomberg published an article titled "Lululemon Slides as New Product Sales Pause Spooks Analysts" that reported that a Lululemon spokesperson had informed Bloomberg that Lululemon had paused sales of the Breezethrough leggings to "make any adjustments necessary to deliver the best possible product experience."

84.    On this news, the Company's share price fell $24.74, or more than 9%, to close at $247.32 per share on July 25, 2024, on unusually heavy trading volume.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

87.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

88.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Lululemon, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

89.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

90.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lululemon and at all times acted within the course and scope of such agency.

**THE INDIVIDUAL DEFENDANTS SOLD STOCK WHILE THE COMPANY'S STOCK PRICE WAS ARTIFICIALLY INFLATED**

91.    As a result of the above false and misleading statements, the Company's share price was artificially inflated. Certain of the Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of Lululemon common stock. Defendants McDonald and Frank collectively sold more than 26,000 shares of their personally-held stock for collective gross proceeds in excess of $13 million.

92.    Specifically, Defendant McDonald sold a total of 25,000 shares while the price of the Company's stock was artificially inflated, earning approximately $12,437,539 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds[1] | Losses Avoided[2] |
|---|---|---|---|---|
| 12/18/2023 | 12,500 | $495.0002 | $6,187,503 | $3,096,003 |
| 12/18/2023 | 12,500 | $500.0029 | $6,250,036 | $3,158,536 |
| **Total** | **25,000** | | **$12,437,539** | **$6,254,539** |

93.    Defendant Frank sold a total of 1,553 shares while the price of the Company's stock was artificially inflated, earning approximately $776,500 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 12/18/2023 | 1,553 | $500 | $776,500 | $392,412 |

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES**

94.    During the Relevant Period, Lululemon repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. In total, the Company expended over $533 million repurchasing 1,499,675 shares of its own common stock at prices that did not reflect the actual value of the stock. As a result, Lululemon overpaid for repurchases during the relevant period by more than $162 million.

95.    As reported in the 2023 Form 10-K, between January 1, 2024 and January 28, 2024, the Company repurchased 59,180 shares of its own common stock for a total approximate cost of

---

[1] Rounded to the nearest whole dollar.
[2] Calculated using the $247.32 closing price on July 25, 2024, the day the truth fully emerged.

$28,627,141.40, or an average price of $483.73 per share. Given that the Company's stock was actually worth only $247.32 per share,[3] Lululemon overpaid for those purchases by approximately $13,990,743.80.

96.     As reported in the Q1 2024 Form 10-Q, between January 29, 2024 and February 25, 2024, the Company repurchased 116,858 shares of its own common stock for a total approximate cost of $53,706,768.22, or an average price of $459.59 per share. Given that the Company's stock was actually worth only $247.32 per share, Lululemon overpaid for those purchases by approximately $24,805,447.66.

97.     As reported in the Q1 2024 Form 10-Q, between February 26, 2024 and March 31, 2024, the Company repurchased 186,147 shares of its own common stock for a total approximate cost of $82,137,363.75, or an average price of $441.25 per share. Given that the Company's stock was actually worth only $247.32 per share, Lululemon overpaid for those purchases by approximately $36,099,487.71.

98.     As reported in the Q2 2024 Form 10-Q, between April 29, 2024 and May 26, 2024, the Company repurchased 478,784 shares of its own common stock for a total approximate cost of $165,822,050.56, or an average price of $346.34 per share. Given that the Company's stock was actually worth only $247.32 per share, Lululemon overpaid for those purchases by approximately $47,409,191.68.

99.     As reported in the Q2 2024 Form 10-Q, between May 27, 2024 and June 30, 2024, the Company repurchased 658,706 shares of its own common stock for a total approximate cost of $203,566,502.64, or an average price of $309.04 per share. Given that the Company's stock was

---

[3] The price at the close of trading on July 25, 2024, when the truth fully emerged.

actually worth only $247.32 per share, Lululemon overpaid for those purchases by approximately $40,655,334.32.

## DAMAGES TO LULULEMON

100.    As a direct and proximate result of the Individual Defendants' misconduct, Lululemon has expended and will continue to expend significant sums of money.

101.    Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

102.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

103.    As a direct and proximate result of the Individual Defendants' conduct, Lululemon has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

105.    Lululemon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

106.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative

litigation.

107.    Plaintiff is an owner of Lululemon stock and has been a continuous holder of the Company's common shares at all relevant times.

108.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following eleven individuals: Defendants Morfitt, Mussafer, McDonald, Casey, Grant, Henry, List, Loehnis, Mahe, McNeill, and White (the "Director Defendants"). Plaintiff is required to show that six directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

109.    Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

110.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized,

and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

111.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

112.    Demand upon Defendant Morfitt is futile for the following additional reasons. Defendant Morfitt has served as a Company director since December 2008 and as Chair of the Board since March 2022. The Company provides Defendant Morfitt with significant compensation as detailed above. Defendant Morfitt signed the 2020, 2021, 2022, and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Morfitt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

113.    Demand upon Defendant Mussafer is futile for the following additional reasons. Defendant Mussafer has served as a Company director since September 2014. The Company provides Defendant Mussafer with significant compensation as detailed above. Defendant Mussafer signed the 2020, 2021, 2022, and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons,

Defendant Mussafer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

114.   Demand upon Defendant Casey is futile for the following additional reasons. Defendant Casey has served as a Company director since October 2007 and previously served as Chair of the Board from May 2014 to September 2014. The Company provides Defendant Casey with significant compensation as detailed above. Defendant Casey signed the 2020, 2021, 2022, and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Casey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

115.   Demand upon Defendant Grant is futile for the following additional reasons. Defendant Grant has served as a Company director since November 2023. The Company provides Defendant Grant with significant compensation as detailed above. Defendant Grant signed the 2023 Forms10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Grant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

116.   Demand upon Defendant Henry is futile for the following additional reasons. Defendant Henry has served as a Company director since January 2016. The Company provides

Defendant Henry with significant compensation as detailed above. Defendant Henry signed the 2020, 2021, 2022, and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Henry breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

117.    Demand upon Defendant List is futile for the following additional reasons. Defendant List has served as a Company director since March 2024. Defendant List signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant List breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

118.    Demand upon Defendant Loehnis is futile for the following additional reasons. Defendant Loehnis has served as a Company director since January 2022. The Company provides Defendant Loehnis with significant compensation as detailed above. Defendant Loehnis signed the 2021, 2022, and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Loehnis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent

or disinterested and, thus, demand upon her is futile and, therefore, excused.

119.    Demand upon Defendant Mahe is futile for the following additional reasons. Defendant Mahe has served as a Company director since November 2022. The Company provides Defendant Mahe with significant compensation as detailed above. Defendant Mahe signed the 2022 and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Mahe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

120.    Demand upon Defendant McNeill is futile for the following additional reasons. Defendant McNeill has served as a Company director since April 2016. The Company provides Defendant McNeill with significant compensation as detailed above. Defendant McNeill signed the 2020, 2021, 2022, and 2023 Forms 10-K, and solicited the Proxy Statement, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McNeill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

121.    Demand upon Defendant White is futile for the following additional reasons. Defendant White has served as a Company director since November 2011. The Company provides Defendant White with significant compensation as detailed above. Defendant White signed the 2020, 2021, 2022, and 2023 Forms 10-K, and solicited the 2024 Proxy Statement, all of which

contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant White breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand upon the Board is futile follow.

123.    Defendants Morfitt, Casey, Grant, Henry, and Loehnis either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices as alleged above. Therefore, Morfitt, Casey, Grant, Henry, and Loehnis cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

124.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Lululemon stock and stock options they held.

125.    The Director Defendants, as members of the Board, were and are subject to the

Company's Code of Business Conduct and Ethics, which goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Lululemon's standards of business conduct. The Individual Defendants violated the Code of Business Conduct and Ethics because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Business Conduct and Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

126.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

127.    The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lululemon. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or

certain officers of Lululemon, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

128.    If there is no liability insurance, then the Director Defendants will not cause Lululemon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

129.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## <u>COUNT ONE</u>

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

132.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded to be misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lululemon not misleading.

134. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Lululemon.

135. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

136. As a result of the foregoing, the market price of Lululemon common stock was artificially inflated during the relevant period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Lululemon common stock in purchasing Lululemon common stock at prices that were artificially inflated as a result of the false and misleading statements and was damaged thereby. In addition, Lululemon

was damaged by the Individual Defendants' violations of §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 1,499,675 of its own shares at artificially inflated prices, causing damage to the Company.

137.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## COUNT TWO

**Against Defendants McDonald and Frank for Contribution Under Sections 10(b) and 21D of the Exchange Act**

138.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.    The conduct of Defendants McDonald and Frank as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

140.    Lululemon and Defendants McDonald and Frank are named as defendants in the related Securities Class Actions that allege and assert claims arising under the federal securities laws. Lululemon is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

141.    If Lululemon is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants McDonald and Frank as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Lululemon is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

142.    As officers and directors, Defendants McDonald and Frank had the power or ability to, and did, control or influence, either directly or indirectly, Lululemon's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

143.    The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

144.    Defendants McDonald and Frank have damaged the Company and are liable to the Company for contribution.

145.    As such, Lululemon is entitled to receive all appropriate contribution or indemnification from Defendants McDonald and Frank.

## COUNT THREE

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    The Director Defendants solicited the 2024 Proxy Statement containing materially false and misleading statements and/or omissions.

148.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

47

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

150.    Under the direction and watch of the Director Defendants, the 2022 and 2023 Proxy Statements failed to disclose that: (i) the Individual Defendants made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (ii) the Board failed to adequately carry out its risk management and oversight obligations as described in the 2024 Proxy Statement and failed to adhere to the Code of Conduct.

151.    The 2024 Proxy Statement also failed to disclose that: (i) the Company was experiencing issues with its inventory allocation and color palette execution; (ii) as a result, the Breezethrough legging launch underperformed; (iii) due to the foregoing, the Company's sales in the Americas began to stall; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

152.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement.

153.    As a result of the Director Defendants causing the 2024 Proxy Statement to be false

and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the re-election of the Defendants McDonald, Mahe, Morfitt, White, Grant, and List to the Board of Directors; (ii) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered accounting firm; and (iii) the compensation of the Company's named executive officers.

154.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

155.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    The Individual Defendants, by virtue of their positions with Lululemon and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Lululemon and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Lululemon to engage in the illegal conduct and practices complained herein.

158.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Breach of Fiduciary Duties

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lululemon's business and affairs.

161.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lululemon.

163.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

164.    In further breach of their fiduciary duties owed to Lululemon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) the Company was experiencing issues with its inventory allocation and color palette execution; (ii) as a result, the Breezethrough legging launch underperformed; (iii) due to the foregoing, the Company's sales in the Americas began to stall; (iv) the Company failed to maintain internal controls; (v) the IDEA program was not structured so as to meaningfully combat discrimination within Lululemon; and (vi) as a result, Lululemon employees continued to experience discriminatory treatment.

165.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

166.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

167.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

168.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lululemon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff on behalf of Lululemon has no adequate remedy at law.

## COUNT SIX

### Against the Individual Defendants for Unjust Enrichment

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lululemon.

173.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Lululemon that was tied to the performance or artificially inflated valuation of Lululemon or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

174.    Plaintiff, as a shareholder and a representative of Lululemon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

175.    Plaintiff on behalf of Lululemon has no adequate remedy at law.

## COUNT SEVEN

### Against the Individual Defendants for Waste of Corporate Assets

176.    Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

177.    The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

178.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

179.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

180.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.      Awarding punitive damages;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 18, 2024                    **THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, James Wong am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

11/9/2024

Signed by:

James Wong